IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHERYL MUELLER, MARSHALL WALTERS, and NEW CONCEPT STAINING, LLC,** | : CIVIL ACTION NO. 1:22-CV-1576 :<br>: (Judge Conner) |
| **Plaintiffs** | : |
| v. | : |
| **MICHAEL CARROLL**, in his official capacity as Pennsylvania Secretary of Transportation, and **PETE BUTTIGIEG**, in his official capacity as U.S. Secretary of Transportation, | : |
| **Defendants** | : |

## MEMORANDUM

Plaintiffs Cheryl Mueller, Marshall Walters, and New Concept Staining, LLC, ("NCS") bring this race-discrimination suit against defendants Pennsylvania Secretary of Transportation Michael Carroll and United States Secretary of Transportation Pete Buttigieg under the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Fifth and Fourteenth Amendments to the United States Constitution. Defendants move to dismiss plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim. We will grant their motions and dismiss plaintiffs' amended complaint for want of jurisdiction.

I.    **Factual Background & Procedural History**

    A.    **The "Disadvantaged Business Enterprise" Program**

The United States Department of Transportation ("the Department") created the Disadvantaged Business Enterprise ("DBE") Program in 1980, under authority of Title VI of the Civil Rights Act of 1964 to remedy discriminatory contracting practices in federally funded transportation projects. (See Doc. 26 ¶ 9 (citing U.S. Dep't of Transp., *Disadvantaged Business Enterprise (DBE) Program*, https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (last updated Nov. 25, 2022) ("DBE Program Webpage")). Congress has reauthorized the program by statute several times, most recently in the Infrastructure Investment and Jobs Act. See Act of Nov. 15, 2021, Pub. L. No. 117-58, 135 Stat. 429. Recipients of federal funds must develop and implement their own DBE programs in conformity with Department regulations. (See Doc. 26 ¶ 17); see also DBE Program Webpage (citing 49 C.F.R. Parts 23, 26).

State agencies like Pennsylvania's Department of Transportation ("PennDOT") are primarily responsible for "ensur[ing] that only bona fide small firms, owned and controlled by a socially and economically disadvantaged individual(s), are certified to participate as DBEs in [] federally assisted programs." See DBE Program Webpage. Funding recipients must participate in a Unified Certification Program to qualify as DBEs, and PennDOT's certification decisions are binding on all recipients throughout the Commonwealth. (See Doc. 26 ¶¶ 20-23). For certification purposes, federal law presumes "socially and economically disadvantaged individuals" include racial or ethnic minorities "or any other

2

individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act"; regulations extend that rebuttable presumption to women. (See id. ¶ 14 (quoting Fixing America's Surface Transportation Act, Pub. L. No. 114-94 § 1101(b)(2)(B); 15 U.S.C. § 637(d)(3)(C); see also id. ¶ 19 (quoting 49 C.F.R. § 26.5)). A firm is considered "owned and controlled by" socially and economically disadvantaged individuals if one or more of those individuals owns at least 51% of the company or its stock and controls "management and daily business operations." (See id. ¶ 13 (quoting 15 U.S.C. § 637(d)(3)(C)). At least 10% of Department funds must "be expended through" such firms, (see id. ¶ 11 (quoting Pub. L. No. 114-94 § 1101(b)(3)), though federal regulations consider this an "aspirational goal," (see id. ¶ 18 (quoting 49 C.F.R. § 26.41(b)). Lastly, Department regulations forbid both funding recipients and certification programs from discriminating against protected classes. (See id. ¶ 24).

    **B.**     **NCS's Application for DBE Certification**

Mueller owns and controls NCS, a company that "provides color concrete staining services to commercial and residential customers in the mid-Atlantic region and parts of New England," and often bids for federally funded projects. (See id. ¶¶ 25-27). Federal law presumes Mueller qualifies as a socially and economically disadvantaged individual because she is a woman. (See id. ¶ 28). In December 2021, NCS applied for DBE certification through PennDOT. (See id. ¶ 29). PennDOT rejected NCS's application in June 2022, concluding NCS does not meet certification standards. (See id. ¶ 30; see also Doc. 26-1).

PennDOT's concerns centered on Walters' role in NCS. NCS's DBE application identified Mueller as 51% owner of the company, with an initial investment of $51, and Walters as 49% owner, after an initial investment of $49. (See Doc. 26-1 at 1). Mueller indicated she brought in Walters—a nondisadvantaged white male who owns outright several other businesses and is not involved in NCS's daily operations, (see id. at 1 n.1, 3)—for "advice, insight, knowledge, experience and support," (see id. at 1). PennDOT examined NCS's filings and discovered Mueller's $51 payment to purchase the company was drawn from her checking account in mid-November 2019 on a check dated July 1 of that year and stamped "Cust: Architectural Polymers"; Walters' $49 check was dated and deposited on December 12 and included the same stamp. (See id. at 2). Walters has been chief executive officer of Architectural Polymers since 1992; Mueller was chief operating officer of Architectural Polymers from August 2016 to June 2019. (See id. at 3).

NCS's application and Mueller's interview—which she attended virtually using Architectural Polymers' Zoom account, (see id.)—revealed other troubling issues, in PennDOT's view. For instance, NCS leases its office space and storage area from Architectural Polymers in the complex they both share, and NCS pays the latter monthly for office expenses and utilities. (See id.) However, the amounts NCS should have been paying per the lease agreement ($25 for rent and $65 for expenses) did not match the amounts Mueller indicated in her interview ($250 for rent) or the amount she actually paid ($270). (See id.) PennDOT also reviewed NCS's account at PNC Bank and concluded Mueller lacked exclusive control of NCS funds; although Mueller and Walters are signatories on the account, Walters

4

had signed each cancelled check PennDOT examined. (See id. at 4). Mueller could not explain why "a multitude" of credits on NCS's statements referenced "corporate ACH Payments Ap Inc/Ap Thermo Ncs"—AP Thermoforming, LLC, being yet another Walters-owned entity. (See id.; see also id. at 1 n.1).

Walters' companies appeared inextricably intertwined with NCS in other ways as well. NCS's opening balance sheet as of July 1, 2019, included a note payable to "APEX"—*i.e.*, AP Exports, Inc., a Walters firm—in the amount of $25,000. (See id. at 2). Mueller explained NCS used the cash for start-up equipment and supplies and paid it back by the end of 2019, but NCS failed to provide a copy of the loan agreement or terms upon PennDOT's request. (See id.) PennDOT was not satisfied Mueller's and Walters' contributions were commensurate with their ownership percentages. (See id.) NCS's balance sheet at the end of 2020 included two amounts of between $34,000 and $35,000 "Due to Apes" or "AP," and a third for over $68,000 "Receivable – Inter Company," suggesting NCS received "significant financial support" from non-DBE firms. (See id.) W-2 forms for fiscal year 2021 showed NCS paid more than $50,000 to Danny Seiler, Architectural Polymers' staining manager. (See id.) Mueller provided a form 1096 for contract review legal expenses identifying as NCS's contact someone using an Architectural Polymers email address. (See id.) The preview heading on NCS's payroll report as of March 6, 2022, listed AP Thermoforming in the Client ID. (See id.) And Mueller's own wages in 2020 and 2021 vastly exceeded NCS's net income. (See id.)

None of these business arrangements were normal industry practice, according to PennDOT. (See id.) If anything, the documents Mueller submitted

5

demonstrated the "indispensable role" Walters and his business played at NCS. (See id.) Based upon the totality of the record, including the applicants' failure to supply necessary documentation for the APEX loan, PennDOT concluded Mueller did not meet her burden of proving she was NCS's bona fide owner, and thus denied DBE certification. (See id. at 4-6 (citing 49 C.F.R. § 26.71)). PennDOT notified Mueller she could appeal the decision administratively at the state and federal levels, (see id. at 6-7), but she did not.

Mueller believes PennDOT denied NCS's application due to Walters' race and that the outcome would have been different if Walters was not white. (See Doc. 26 ¶¶ 31-32, 35). Plaintiffs allege PennDOT's decision makes them less competitive for government contracts compared to DBE-certified companies, thus reducing NCS's value. (See id. ¶ 33). They identify a dozen projects from which NCS was "categorically excluded" in favor of DBEs and suggest such exclusions will persist as long as they lack DBE certification. (See id. ¶ 34; see also Doc. 26-2). Plaintiffs seek declaratory and injunctive relief to prohibit PennDOT from withholding certification and to eliminate use of racially discriminatory criteria from the federal government's contracting practices. (See Doc. 26 ¶ 36).

### C. Procedural History

Mueller filed this lawsuit in October 2022. She amended her complaint in January 2023, adding Walters and NCS as plaintiffs. Defendants each move to dismiss the suit under Rule 12(b). The motions are fully briefed and ripe for disposition.

## II. <u>Legal Standard</u>

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1). Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction. <u>Lincoln Benefit Life Co. v. AEI Life, LLC</u>, 800 F.3d 99, 105 (3d Cir. 2015) (quoting <u>CNA v. United States</u>, 535 F.3d 132, 139 (3d Cir. 2008)). In either instance, it is the plaintiff's burden to establish jurisdiction. See <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977). Courts reviewing facial challenges "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." See <u>Gould Elec. Inc. v. United States</u>, 220 F.3d 169, 176 (3d Cir. 2000) (citing <u>Mortensen</u>, 549 F.2d at 891; <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III. <u>Discussion</u>

Defendants facially challenge plaintiffs' standing to bring this action. (See Doc. 30 at 7-13; Doc. 31 at 9-14). Article III of the United States Constitution limits federal court jurisdiction to "cases" or "controversies." See U.S. CONST. art. III, § 2. A plaintiff establishes Article III standing by demonstrating "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of,

7

and (3) a likel[ihood] that the injury will be redressed by a favorable decision." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) (internal quotation marks omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  To avoid impermissibly assessing the merits, a court must "assume for the purposes of [a] standing inquiry that a plaintiff has stated valid legal claims."  See Cottrell v. Alcon Labs., 874 F.3d 154, 162 (3d Cir. 2017) (citation omitted).

Defendants contest standing on all three prongs, but we conclude the justiciability inquiry rises—and ultimately falls—on redressability.  Courts undertake a probabilistic assessment to determine whether an injury is judicially redressable.  Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 143 (3d Cir. 2009).  To that end, a plaintiff must show a "substantial likelihood" the relief they demand will remedy their injuries.  See id. (quoting Vt. Agency of Nat. Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 771 (2000)).  Plaintiffs cannot meet their burden here.

Plaintiffs allege defendants administer and enforce the DBE certification program in a racially discriminatory manner resulting in NCS's categorical exclusion from government contracts that are only offered to DBE-certified businesses.  (See Doc. 26 ¶¶ 34-35).  They seek injunctive relief to prohibit defendants from considering race as part of the certification process along with a declaratory judgment that withholding NCS's certification violates federal law. (See id. ¶ 55).  PennDOT does not mention race at all in its letter to Mueller, a copy of which plaintiffs attached to their complaint, (see Doc. 26-1), though the agency identifies Walters as a "non-disadvantaged male," (see id. at 1 n.1)—a

socioeconomic characterization plaintiffs do not dispute.  The agency explains in great detail that NCS did not meet standards for DBE certification, notwithstanding Mueller's status as a socially and economically disadvantaged person, for two primary reasons.  First, Mueller failed to prove her minimal contributions to NCS were commensurate with her majority ownership interest.  (See id. at 2).  Mueller paid $51 for a 51% stake in NCS, but that amount pales in comparison to the $25,000 capitalization note NCS owed to AP Exports on its opening balance sheet.  (See id.)  Walters owns 100% of AP Exports, (see id.), thus he effectively contributed $25,049 for a 49% stake in NCS.  By all appearances, Walters was the bona fide owner of NCS.  Mueller frustrated PennDOT's efforts to scrutinize her transactional relationship with Walters by failing to provide a note agreement or terms sheet after the agency requested one.  (See id.)  Federal regulations expressly require applicants to submit loan documentation to ensure ownership is not merely *pro forma*, see 49 C.F.R. § 26.69(c)(1), yet Mueller did not satisfy this basic obligation.

Second, the administrative record contains abundant evidence Mueller did not exercise independent control of NCS, another essential requirement for DBE certification.  (See Doc. 26-1 at 2).  NCS rents office space and leases equipment from Walters' businesses.  (See id. at 3).  Walters and Mueller are jointly authorized signatories on NCS's bank account, but Walters signed all the checks submitted with NCS's application, reflecting Mueller's lack of exclusive control of company finances.  (See id. at 4).  NCS relies upon Walters' companies for "significant financial support."  (See id.)  NCS's highest-paid employee after Mueller is a manager in Walters' employ.  (See id.)  NCS shares legal and payroll resources with

9

Walters' businesses.  (See id.)  And Mueller's wages over a two-year period far exceeded NCS's net income for those years, necessitating third-party intervention. (See id.)

Enjoining defendants from considering race as part of the DBE-certification process would not compel PennDOT to certify NCS as a DBE.  PennDOT has sufficient cause to continue denying NCS's application based upon the foregoing documentary omissions and unsatisfactory responses to legitimate concerns about the company's true ownership and dependence on third-party benefactors.  It is substantially *unlikely* the judicial decree plaintiffs seek would remove these race-neutral impediments to NCS's candidacy.  We will not interpose to short-circuit the certification process or arbitrarily excuse plaintiffs from evidentiary burdens all other applicants must bear.  Because their claims are not redressable, they lack standing to pursue them.

**IV.   Conclusion**

We will grant defendants' motions and dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   September 7, 2023